May it please the Court, I represent Appellant Canter, a shareholder of MedQuist, who filed a complaint on November 12, 2004, suing Phillips and 10 directors of MedQuist for breaches of fiduciary duties of loyalty, good faith, and due care, arising out of serious accounting irregularities which occurred at MedQuist. Appellant argues that the lower court did not follow the legal precepts of Article 12b-6, which requires the Court to accept as true plaintiff's allegations, draw all inferences in favor of plaintiff. You can rest assured that we know the facts and we've read the record of the opinions and so you've got two hurdles, you've got to show that the directors were not independent or not disinterested, or at least the reasonable probability, and then of course there's a New Jersey issue as well, but why don't you tell us why you didn't need to plead to Med? Well, in addition to Phillips owning 71% of the company, which was not all that Phillips owned. Of course, that may enlighten them, doesn't it? Does that argument cut both ways? It cuts both ways and that's what the lower court felt, but it doesn't in the fact that MedQuist owned 94% of the stock and Stewart owned 94% of the stock, and I guess the company was Stewart, they were their own company, and that in and of itself was not enough. Correct. But it's not just the percentage ownership here, it's that these individuals, and she appointed the directors, and it was the directors of the company in issue. Okay. And the situation at hand is not just that Phillips is appointing these six directors plus appointing the CEO in her positions at MedQuist, but that these directors also have positions at Phillips. Good. Now, excuse me. Sorry. Are we all on the same page that there were six directors at the time, three were outside directors? Well, we're not on the same page with that respect. Oh, I thought we were. He and I are on the same page. That's the problem. Right. But you know what? It doesn't even matter to me, quite honestly, because if it's six directors that are in existence at the time, you only need to prove that three are disinterested, but the point with respect to that is, Your Honor, that these directors violated the laws at that point also, because they didn't file Form 8K saying that they resigned or retired, which is required. So this company has a predilection, let's say, of ignoring the securities laws. I thought maybe I'm wrong about this, but I thought when it came to the attention of the board that we had these inflated, I guess, lines and holes, inflated figures, that they hired Pricewaterhouse and Devilwoods to do an independent investigation. Isn't that what they're supposed to do? Well, that is that they are supposed to do that, and they eventually did do that. But the argument is that this had been going on long before, while the Phillips directors were in position, and they just completely ignored it. What red flags were there to let them know that something was going on? What did you allege? For the interested test and for the independence test, Your Honor, we don't need to allege red flags. For the independence test, it's... So you're showing something other than the relationship or the relationship, the nexus of the directors. But there's one important fact here that is being glossed over and was glossed over by the lower court. There was a governance agreement in place. The governance agreement actually defined what an independent director was. So that that by, and that is alleged in the complaint, at paragraph 14, 14B, the proxy statement, it defines an independent director as a director who has not or has never been an employee or officer of Medquist, any affiliate or associate of Medquist, or who has not or has never been an officer, employee, or director of Phillips. Would you explain where that is in the record? What volume and page? We're having trouble hearing you, John. Could you repeat that? Would she identify the volume and page where that appears? That's in the complaint, which... Well, where is the complaint in the record? It won't be here. No, I don't have it with me. It's in the appendix. It is in the appendix in the record, Your Honor. And I don't have the exact page with me. What page? It's page seven of the complaint, but I don't know what page of the appendix, Your Honor. Is that the joint appendix? Yes, Your Honor. All right. Thank you. But that language itself should be taken honestly, should be taken as true, and all inferences should be drawn in the panel's favor that automatically there is a question as to independence. Additionally, in the proxy statement, with respect to the discussion of the audit committee, the discussion states that the audit committee is chaired by Curran, who is not an independent director. I mean, these are specific documents that are referenced, that are signed by the directors, that are put out by Medquist, and those inferences should be drawn in plaintiff's favor. There's a question as to what degree of deference you get on the drawing of inferences, since in these kinds of cases you have to plead with particularity. Why is it more required? Why should we? This is not normal notice pleading. This is something more than that. And so there are specific references to these documents in the complaint, as far as the connection between Phillips and its directors. There's specific discussion in the complaint as to this governance agreement, as to the license. What this was telling me is what do you allege they have done that would suggest that they're incapable of acting as an independent director, except for the relationship that they have, even assuming, as we must, that that relationship might breach, I guess, of one of the agreements. But whatever it is laid out that establishes what a good director is, assuming they have not done it, what have you alleged to show the other men? I'm sorry, go ahead. I'm sorry. We've alleged that they've breached their earmarked duties, that they have totally breached their duty of loyalty to the corporation by failing to prevent violations of the law, by completely ignoring and just not addressing the accounting irregularities which were going on at Medquist, at the highest levels of officers who were... What is in the complaint alleging that they knew of those accounting irregularities before they took action to bring them in front of Board of Trustees? In the complaint, there are no allegations of their knowledge because the argument is that they were so reckless in their conduct that they did not have knowledge. They just completely ignored it. They weren't interested in focusing on what was going on at Medquist. All they were interested in doing is making sure that Medquist financial numbers were at the appropriate level for them to have the reciprocal positive effect on Phillips consolidated financials. Not alleged in the complaint, but in the class complaint, was the fact that Phillips bought their stock at $50 a share. Well, the Medquist stocks had gone down. Correct. So that Phillips, too, wanted to have a stock price just like a Medquist shareholder rise and go back to the level at which it purchased. But the difference is that if that stock price did not reach certain levels within a certain time, Phillips would have to take an impairment charge because the value had decreased. Well, that impairment charge was taken by Phillips after the complaint was filed to the tune of 540 million euros, or 520 million euros, which is about $740 million, which is a lot of money here that has just been squandered in all honesty. I'm sorry. I thought I heard Judge Noonan. You heard a sneeze. You heard a sneeze. Okay. That's what I thought I heard. I'm sorry. That came from the loud enclosure. Bless you, Your Honor. Okay. Not only did Phillips control Medquist through its 71% ownership, through its governance agreements, but Phillips also actually put on board the CEO of Medquist beginning in December 2003. So there are other indicia that could have come to the board. There's also an indicia that is not alleged in the complaint, which we found out afterwards after the complaint was filed. It's not alleged in the complaint. It's not alleged in the complaint, but I would have requested a right to amend, which was denied, and I do feel strongly that we should have been granted our one chance to amend without any notice. Ms. Carlson, why did you not submit an amended complaint? I'm sorry. Why did you not submit an amended complaint? Because I didn't think that at that point in time, after the oral argument, that that was the appropriate time to submit an amended complaint. I felt that the complaint that I had pled was strong enough based on the actual language in the complaint about independence versus an interestedness. The court at that time expressed an interest in knowledge, which I did not feel was necessary because we are alleging a care mark, a breach of duty of loyalty. There were these continuous violations of security. A care mark was a case that involved significantly different circumstances. Did it not in conduct? Significantly different, but care marks have been interpreted by the Oxford Court, which involved exactly a similar situation here. And the Oxford Court held that the care mark violations are still serious and valid. And recently in Delaware, the defendant submitted a case to Your Honor, which is in Stone, where the court there held that violations of the law are violations of the duty of loyalty. Anything else you want to tell us? I know you have the red lights on. Anything else you want to tell us? I was reserving. I hope I didn't. No, we'll give you a reason. All right. I'll reserve five minutes for a moment. All right. Very good. Thank you. Mr. Marder. Thank you, Your Honor. Good afternoon, Your Honors. Neal Marder for MedQuist. I've asked for a portion of my time to talk this afternoon primarily about the issue of leave to amend, but I'm perfectly willing to answer other questions. I do have my colleagues here on behalf of Phillips and the directors who would like the opportunity to address any questions you may have about the exculpatory clause in the charter, the issues of independence and interestedness. But as I go through my argument, I'd be happy to answer any of those questions as well. We certainly believe that the district court got it right and that it applied the correct legal precepts to the allegations in this complaint and did not abuse its discretion in finding in its rulings both on demand futility and leave to amend. And there's really no dispute about the legal precepts that the court applied. The appellants cite them in their papers. It's the same precepts that were in the court's holding. So this is really an issue of whether the court abused its discretion. The question was put to Ms. Gross, why didn't she file a proposed amendment? And I think that's a very fair question to be asking, particularly in light of the fact that the district court, when it reviewed the pleadings, heard argument and expressed its considerable skepticism over the generalities of the allegations in the complaint, asked Ms. Gross to proffer what facts she would present if she was afforded leave to amend. And at that time, she was able to proffer very little. The court ultimately dismissed the case with prejudice and counsel filed a motion for reconsideration. And the reconsideration motion was primarily, I should say exclusively, directed at this one issue that you asked about, Judge McKee, the issue of leave to amend. At that time, again, there was no facts that were proffered, no proposed amendment upon which the judge could consider. And as a result of that, the judge denied reconsideration. This appeal followed. In the briefs that have been submitted to this court, Ms. Gross has been, certainly had the opportunity to proffer additional facts. And to this day, there are no facts that have been proffered other than the allegations and three related class action complaints that Ms. Gross has asked the court to take judicial notice of. Now, if this court were to take judicial notice of those complaints and even take judicial notice of the allegations and accept those allegations as true and assume that they were allowed to allege those allegations in this complaint, they still would not demonstrate a... They still would not provide the sufficient facts to support demand excuse. They still would not provide sufficient facts to demonstrate a substantial likelihood of any board members being exposed to personal liability under a caremark claim. I'm not even sure we can consider it, but are these directors named in those actions? That's a very good question. First of all, our position is you can't consider them because all you're really allowed to do is take judicial notice of the existence of the complaints. But it really demonstrates how little they have to go on. That's what they're relying upon in their briefs when they say, well, here's what we would do if we could. We would insert, we would cut and paste, we would add the allegations from these other complaints. And the answer to your question, Judge McKee, is no. The board director... The directors that are named in this case aren't even named as defendants in these other cases. There's not a single allegation against any of those directors in these related cases that would expose them to personal liability. When you look at the factors that this court needs to consider in deciding whether the board has a disabling... There's no allegations they point to because they don't exist that would suggest that the board members had red flags, that there were warning signals, OK, that they not only failed to acknowledge, which would just be a breach of duty of care, but they consciously ignored. There's no allegations in any of those complaints about controls, systems that were not in place, that should have been placed, any of the factors when courts have considered care mark claims have said must be pled with particularity in order to give rise to that claim. So it leads to only one inescapable conclusion. Even if they were allowed leave to amend and they amended their complaint, as if this is all they have to rely upon, such an amendment would be futile. That is the conclusion that the district court properly reached both in its initial decision and on reconsideration. They simply... Ms. Gross says that we can make appropriate inferences pertaining to her pleadings here. You would obviously disagree with that. No, actually, inferences, reasonable inferences, are supposed to be drawn in Ms. Gross's favour. The allegations of the complaint are supposed to be accepted as true. And the district court acted appropriately in accepting the allegations as true and drawing reasonable inferences in her favour. But what the court is not obligated to do, and indeed should not do, is accept mere bald conclusions in the complaint as true. And that's really what... If you take a close look at their complaint, that's really all it is. It talks in paragraphs 41 to 49, which are the key allegations in the complaint, as it relates to the directors, about using the buzzwords, the boilerplate allegations you commonly see, participated, knew, she says reckless. Where are the facts? Where are the particular facts they're obligated to plead under Rule 23.1 in order to take away from the board their normal duties to assess whether or not to pursue litigation or not pursue litigation? That's what's required under Rule 23.1. There's a reason why it's a heightened pleading standard. The legislature adopted Rule 23.1, similar to Rule 9 when you're alleging fraud, because it's a serious claim. If you're going to try and take away the normal functions of a board of directors and you're not going to make a demand, you had darn well better plead in your complaint the particular facts that create a reasonable doubt as to their objectivity. They didn't do that. The court said below, even giving them the benefit of the doubt and accepting all the allegations as true, they really don't come very close. And so that's why I focused the argument today on whether or not they should be given leave to amend. And in this instance, the answer is clearly no. They should not be given leave to amend. They had their shot. They don't get a second bite at the apple. They had the tools at hand in order to do a pre-suit investigation, and they simply did not exercise appropriate due diligence. They could have made a request for an inspection of books and records. They could have looked at the minutes of this company, and they could have then made an assessment of whether or not, in fact, the audit committee, which they allege met five times in 2002, had any red flags. Were there any warning signs? Interestingly, Your Honors, one of the complaints that they wanted to take the judicial notice of was the South Broward claim. The allegations in that case say that this whole billing scheme was a big deception. Customers didn't know about it. Well, if customers didn't know about it, they weren't complaining about it. If they weren't complaining about it, how in the world is the board supposed to have known about it and had any red flags? The board could have known about it, even if the customers didn't know about it. Sure, absolutely, Your Honor. The board certainly could have known about it, but they haven't alleged that. They had to play it with particular facts, and that's really what's wrong with this complaint. And that's really, in my mind, and meaning no disrespect to Ms. Gross, this isn't a closed case. This is a case where they did not get it right the first time, and under the law of this circuit, they don't get to take discovery. They don't get to now make another demand. They got one shot, okay? And they're obligated, because of the serious nature of this claim, to exercise due diligence, and they simply didn't do it. I would reserve the rest of my time. I see I'm up to my colleagues in the event they want to add anything, or I'd be glad to answer any questions, Your Honors. Any other questions for Mr. Barger? Thank you very much. Thank you, Your Honors. Mr. Farley. Good afternoon. Good afternoon, Your Honor. I wish I were Mr. Farley, but I'm Mr. Bodner. Mr. Bodner wishes he were Mr. Farley. I'm not sure that's true, Your Honor. I am Randall Bodner. I represent the outside directors, Messrs. Ruttenberg, Stowe, and Underwood. One quick point. My task is to address, if the court would like me to, any issues dealing with the New Jersey statute, the exculpation statute. I would like to make one point of clarification, however. Your Honor asked about inferences being drawn in favor of the plaintiff. While that is true, it is true only to a degree in the demand-futility context, because there, 23.1, is very clear that a demand of particularity to allege futility of demand with particularity lies with the plaintiff. That was not met here. In my instance, in dealing with the exculpation statute, which is a separate ground for dismissal or for upholding the dismissal by the court below, is under a 12B6 standard. Is one under notice pleading? If we agree with the district court, there's no reason to get to the exculpation statute. I would agree, Your Honor. Absolutely, if you were to find that demand futility was not pled with particularity, there is absolutely no reason to address the exculpation statute whatsoever. One point I will raise is that if the court were inclined to go in that direction for some reason, and again, I agree with my brother, this is not a close call on demand-futility. However, as far as the alternative ground is, the only serious argument, to the degree it's serious, that's raised on appeal about the exculpation statute is simply that this is in the nature of an affirmative defense and therefore, per se, cannot be concluded as far as a motion to dismiss is concerned. That statement, frankly, is just wrong as a matter of law, and indeed, if one were to fully read Tower Air, which is the decision Appellant relies on, Tower Air itself says in the decision at page 238, a complaint may be dismissed under Rule 12b-6 where an unanswered affirmative defense appears on its face, and that's not a new concept. It's certainly not a new law here in the Third Circuit where the cases prior to Third Circuit authority, we cited in our brief the Bethel case, says that an affirmative defense can be used as a basis for a motion to dismiss,  that we cite in our brief that the exculpation provision in various states can provide the basis for a motion to dismiss where it's clear on the face of the complaint, as it is here. With the 30 seconds I have left, Appellant's efforts to plead around the exculpation statute that certain exceptions exist here is not well-founded, and indeed, consistent with the Tower decision, her problem is what she pleads, not what she does not plead, because in this case, in Tower error, the first count of the complaint was dismissed under the liberal reading of Rule 8. Count 1 was dismissed because the court said that where you have a complaint that is self-defeating, where it pleads the basis for a motion to dismiss, even under the more liberal reading of the federal Rule 8, it will grant a motion to dismiss. That's exactly what the case is here. What does she plead that are facts, that are not just simply conclusory incantations or naked labels? The facts that she alleges is there was an audit committee that met five times a year. This audit committee, when confronted with the allegations of a whistleblower, commenced an investigation. They hired nationally renowned outside advisors, Pricewaterhouse and Debevoise and Plimpton, to conduct that investigation. At the conclusion of the investigation, they disciplined the employees who were participating in the questionable conduct. We respectfully submit that that's conduct, but that's action by a board looking at red flags and what they did. They should be complimented for what they did, certainly not sued. I see that my time is up. Anything else you want to tell us? No, Your Honor. I don't think it's been addressed. Thank you very much. Now we'll hear from Mr. Frawley. Thank you, Your Honors. It is Brian Frawley from Sullivan and Cromwell representing Phillips and what we've referred to as the Phillips Directors. I'd like to start out with the point that was raised in my brother, Mr. Martyr's, arguments about the independence argument that the plaintiffs have proffered. And Judge McKee was indeed correct because the independence argument that they have proffered is untethered to any fact that would cause a compromising of the independence. Just to say that the directors have some affiliation with Phillips, are employed by Phillips, are quote-unquote dominated and controlled by Phillips says nothing to advance the plaintiff's cause on the question of independence because you then have to show that Phillips is dependent. That for some reason, Phillips' ability to objectively consider the supposed wrongdoing alleged here is compromised by the facts and circumstances alleged here. There's some very telling allegations in this complaint, admissions by the plaintiff in the district court that completely refute and make it impossible for them to proceed with that basis here. For one, the plaintiff admitted in the district court, it's on page 122 of the appendix, that she doesn't know when this supposed wrongdoing arose, whether it arose before Phillips bought an interest in this company in 2000 or afterwards. So there's no basis to contend that Phillips has some interest in regards to the conduct or participated in the conduct or was responsible for it and we don't even know whether they're a victim of this supposed misconduct or a perpetrator. Secondly, the plaintiff points to some commentary in the governance agreement about who was an interested director. The interest of a director for purposes of New York Stock Exchange rule have nothing to do with this case. The interest that this plaintiff has to show is an interest in the misconduct alleged and an inability to make an objective judgment about the conduct. There's nothing about Phillips' investment in this company in the year 2000 or about the appointment of a couple of its directors on this board in the ensuing four years that demonstrates any compromise of their independence. Indeed, one of the difficulties this plaintiff has, as she also admitted in the district court, is what she did was pick all ten directors who ever served on this board at any time in the four year period and sued them all. She admitted she had no basis to differentiate among any one of them and so far as the Phillips directors are concerned, there are seven individuals who served on this board at different points in time throughout the four year period. Some left in 2001. Some came on in 2003. You can't allege derivative litigation on that basis. You can't establish any disinterestedness, any independence, excuse me, you can't establish any lack of independence or interest in the transaction. I see that my time is up. No, we'll give you a little more time. Did you really stop then? I actually had one other point that I was going to get to, but quite frankly, it's a point that we don't need to get to. Well, we're happy to give you the time. Unless the court was inclined to accept any of the plaintiff's arguments, we also... Well, as you never know, so you may never know. She's a very good lawyer. You know, the plaintiff has in fact asserted actual fiduciary duty claims against Phillip as an entity. On the theory as a controlling shareholder, it owed fiduciary duties to the minority shareholders. There's no dispute. That claim can only be based on a supposed violation of a duty of loyalty. In order to assert a duty of loyalty claim, she has to allege that Phillips actually exercised its control  and it had a countervailing interest to the minority with respect to those transactions. As I said at the outset of this argument, she hasn't even said that these transactions or events occurred on Phillips' watch, so she couldn't possibly allege that they used their control to implement these policies to the detriment of the minority and to their benefit. And with that, Your Honors, if there's no other questions, we rest on our papers. Good. Any questions? Mr. Farrelly, thank you very much. Ms. Gross? A few things I would like to just clarify. One, the defendants that were sued were those listed as directors in the last proxy that Medquist filed with the SEC. Subsequent to that, there were no SEC filings, 8K filings, which are required when a director retires or resigns. That violation of law is a violation of the duty of loyalty. Second, the activeness of this board after the employee was... the employee told the Audit Committee is not 100% in the record, I will say. The employee... I get very nervous when someone says, well, it's not 100% in the record. It is not in the record. There's an allegation in the complaint that says there's a press release by them which says upon being notified by Pricewaterhouse or they count upon being notified in review of their controls, learned of some issues and they followed up on it. There was a whistleblower action. It started in September of 2003. The board didn't begin its actions until February of 2004. They did take some disciplinary action. There's no explanation of what that is. But if one goes to the SEC filings, one learns based on separation agreements with two of those employees that Medquist is giving them their bonuses, giving them their salaries, indemnifying them... If one goes to the SEC filings and one goes to the complaint... If that is not in there because the separation agreement which Medquist signed with these individuals who were disciplined was filed with the SEC appropriately after the complaint was filed. So this information, the information that the plaintiff had when she filed her complaint was that they were disciplined. But the information that came out subsequently which plaintiff would be more than happy to amend a complaint having never been given an opportunity to amend was that these separation agreements provided indemnity for these individuals. Well, this is evidence that the court in Oxford found evidence of demand futility, that this company wouldn't go around, turn around and sue those responsible for the fraud, so therefore demand was futile. Not only that, but it's not that just Phillips had directors on this board. Phillips also had the CEO during this time period. There was a CEO who was hired effective October 1, who left December 1. His employment agreement was for five years. His quick departure was not explained at all. Instead, it was just that Phillips put in somebody. Phillips has been enmeshed in this company. Phillips calls Medquist in Phillips' SEC filings a subsidiary. Whatever Medquist did, Phillips was aware of just by virtue of its total control and enmeshment of Medquist. Phillips provided them with products which they used to sell to their customers. The fact that there were no customers complaining is not accurate either, as the consolidated class action complaint says. There were customers who actually sued Medquist and actually during discovery provided Medquist with three different transcripts to transcribes and received back from Medquist three different bills. If all that is stuff we can consider, why wouldn't that simply establish that the interest of Phillips was aligned with the interest of Medquist? Well, it should and it would, but it's aligned with Medquist but not Medquist shareholders, minority shareholders. I'm sorry, but they're not aligned with Medquist shareholders because Phillips is dependent on earnings, on positive earnings from Medquist as well. Medquist was the only company after this accounting regularity where Phillips has now had negative earnings. They took a $790 million write-down based on their investment based on the consolidated financials. They also had to write down their stock ownership value as well. That was another $30 million. We've kind of gone away from the complaint now. That's correct, Your Honor. Finally, with respect to the cases that the court relies on, the lower court relied on Gutman. Gutman was not a case where there were any similarities and it's important that the lower court relied on, felt strongly about the books and records demand. The language of the Delaware statute in comparison to the New Jersey statute is very different. There are limited words that are missing, but those are important words. In Delaware, the shareholder has a right to request an inspection of the corporation's stock ledger, a list of stockholders, and its other books and records. That's pursuant to a letter. In New Jersey, while a shareholder can request minutes of the proceeding of the limited shareholders and record of shareholders and to make extracts therefrom, if that's not enough, then you may go to a court to compel the production for examination of records of books by shareholder of the books and records of account minutes and record of shareholders. There is not that abundance of New Jersey law which would encourage a books and records inspection by a New Jersey corporation shareholder. By comparison, the Delaware law is clear that it does encourage, based on its Section 220 language, which is different than the New Jersey language, a books and records inspection prior to the filing of a complaint. Good. Anything else you want to tell us? No, that's it. All right. Ms. Gross, thank you. Thank you very much. The court would like to have a transcript made of the argument, and I would ask the parties to share the cost of the transcript and check with the clerk's office when you leave. We thank all counsel for an excellent argument. Thank you. The next matter is...